**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TIFFIN MOTOR HOMES, INC.,

                                        Plaintiff,

                v.                                          Case No.

DENSO CORP., ASMO CO., LTD., MITSUBA
CORPORATION, and AMERICAN MITSUBA
CORPORATION,

                                        Defendants.

## CLASS ACTION COMPLAINT

Plaintiff Tiffin Motor Homes, Inc., individually and on behalf of the proposed class of direct purchasers of Windshield Wiper Systems (as defined below), brings this action against Defendants for damages under the antitrust laws of the United States.

## SUMMARY OF THE CASE

1.      Defendants are manufacturers of Windshield Wiper Systems ("WWS" or "Windshield Wiper Systems") for installation in motor vehicles manufactured or sold in the United States.  Plaintiff alleges that Defendants conspired to rig bids, and to fix, maintain, and/or stabilize the prices of WWS sold in the United States from at least January 1, 2000 through the present.  Plaintiff further alleges that Defendants fraudulently concealed their conspiracy.

2.      On September 26, 2013, the United States Department of Justice ("DOJ") announced that Mitsuba Corporation agreed to plead guilty and pay a $135 million criminal fine for its role in a conspiracy to fix prices of WWS installed in automobiles sold in the United States and elsewhere.

3.     Plaintiff brings this lawsuit as a class action on behalf of direct purchasers who, during the Class Period, purchased WWS in the United States from one or more of the Defendants or their co-conspirators.  This action is brought under Section 1 of the Sherman Act to enjoin Defendants' anticompetitive conduct and recover damages suffered by the Class.

4.     As a result of Defendants' unlawful conduct, Plaintiff and members of the proposed Class paid higher prices for WWS than they would have paid in a competitive market.

## JURISDICTION AND VENUE

5.     Plaintiff brings this action to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violation of the Sherman Act, 15 U.S.C. § 1.

6.     The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.  Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, affected interstate trade and commerce (discussed below) has been carried out in this District, and because one or more of the Defendants reside in this District.

7.     By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court.   Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

## DEFINITIONS

8.      The term "Class Period" refers to the time period from at least as early as January 1, 2000 through the present.

9.      The terms "WWS" or "Windshield Wiper Systems" include the motor, linkage, arm and blade necessary to clear water or snow from vehicle windows.

10.     The term "Defendant" or "Defendants" refers to the named Defendants and all of the named Defendants' predecessors, including WWS manufacturers merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold WWS directly to purchasers in the United States or to purchasers for use in the United States during the Class Period.

11.     References made herein to any corporation include any predecessors, successors, parents, subsidiaries, affiliates and divisions of that corporation.

## TRADE AND COMMERCE

12.     During the Class Period, each Defendant sold WWS in the United States in a continuous and uninterrupted flow of interstate commerce.

13.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## PARTIES

14.     Plaintiff Tiffin Motor Homes, Inc., is an Alabama corporation with its principal place of business located in Red Bay, Alabama.  Tiffin Motor Homes, Inc. purchased WWS directly from one or more Defendants and/or their co-conspirators during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

15.     Defendant Denso Corporation is a Japanese corporation with its principal place of business in Aichi, Japan.  Denso– directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold WWS  that were purchased throughout the United States, including in this District, during the Class Period.

16.     Defendant ASMO Co., Ltd. ("Asmo") is a Japanese corporation with its principal place of business in Shizuoka, Japan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Denso Corporation.  ASMO manufactured, marketed and/or sold WWS that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

17.     Defendants Denso Corporation and Asmo Co. Ltd. are referred to collectively herein as "Denso."

18.     Defendant Mitsuba Corporation is a Japanese corporation with its principal place of business in Gunma, Japan.  Mitsuba —directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold WWS that were purchased throughout the United States, including in this District, during the Class Period.

19.     Defendant American Mitsuba Corporation, located in Novi, Michigan, is a subsidiary of Mitsuba Corporation.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

20.     Mitsuba Corporation and American Mitsuba Corporation are referred to collectively as "Mitsuba."

- 4 -

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

21.     Various persons or firms not named as Defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.   The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

22.     Each Defendant acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action on behalf of itself and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).   The Class is defined as follows:

> All individuals and entities who purchased Windshield Wiper Systems in the United States directly from one or more Defendants and/or their co-conspirators (or their controlled subsidiaries, affiliates, or joint ventures) from at least as early as January 1, 2000 through the present.

24.     Plaintiff does not know the exact number of Class members as such information is exclusively controlled by Defendants.   Because of the trade and commerce involved, however, Plaintiff believes that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

25.     There are questions of law or fact common to the class, including but not limited to the following:

> a.     Whether Defendants engaged in a contract, combination, or conspiracy to rig bids and to fix, raise, maintain, and/or stabilize prices of WWS sold in the United States;

- 5 -

b.     Whether Defendants' conduct caused the prices of WWS sold in the United States to be sold at artificially high levels;

c.     Whether Defendants undertook actions to conceal their unlawful conspiracy; and

d.     Whether Plaintiff and other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members.

26.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

27.     Plaintiff's claims are typical of the claims of the Class because Plaintiff directly purchased WWS from one or more of the Defendants, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiff is common to the Class.

28.     Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is a direct purchaser of WWS and has no conflict with any other members of the Class. Further, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

29.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

30.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

31.     The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## FACTUAL ALLEGATIONS

### Windshield Wiper Systems

32.     WWS are devices used to remove rain and debris from a vehicle's windshield. WWS generally consist of an arm, pivoting at one end and with a long rubber blade attached to the other.  The blade is swung back and forth over the glass, pushing water from its surface.

33.     WWS are installed by automobile original equipment manufacturers ("OEMs") in motor vehicles as part of the manufacturing process.  They are also installed in motor vehicles to replace worn out, defective or damaged WWS.

34.     Many motor vehicle manufacturers purchase WWS directly from Defendants. WWS may also be purchased by other component manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier 1 Manufacturers" in the industry.  Tier 1 Manufacturers supply WWS directly to an OEM.

35.     When purchasing WWS and related products, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers.  Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years.  Typically, the bidding process begins approximately three years prior to the start of production of a new model.  Japanese OEMs procure parts for U.S.-manufactured vehicles both in Japan and the United States.

36.     Defendants and their co-conspirators supplied WWS to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.  Defendants and their co-conspirators manufactured WWS (a) in the United States for installation in vehicles

manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

37.     Plaintiff and members of the proposed Class have purchased WWS directly from one or more of the Defendants.

**The Windshield Wiper Systems Market is Conducive to Collusion**

38.     Several important economic characteristics of the market for WWS plausibly increased its conduciveness to a price-fixing conspiracy.

39.     One such important, economic characteristic of a market conducive to conspiratorial behavior is high barriers to entry.  There are substantial barriers to entry in the market for WWS because of significant start-up capital expenditures.  A new entrant into the business would have to incur millions of dollars in costs, including large investments in plant and machinery, research and development, infrastructure for distribution, transportation, and labor.

40.     Additionally, the market for WWS is highly concentrated.  Upon information and belief, Defendants and their co-conspirators control a majority of the market for the manufacture and sale of WWS for use in motor vehicles manufactured and/or sold in or into the United States.

41.     Inelastic pricing is another important characteristic.  When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relativity inelastic.  Otherwise, increased prices would result in declining use of services, revenues, and profits.

42.     Pricing for WWS is highly inelastic.  Motor vehicle manufacturers must use WWS because there are no viable substitute products.

## DEFENDANTS' ANTITRUST CONSPIRACY

43.     During the Class Period, Defendants and their co-conspirators, the dominant producers of WWS, conspired to (a) rig bids for and allocate the supply of WWS and (b) raise, fix, and maintain prices for WWS sold in or into the United States.

44.     Defendants engaged in numerous acts in furtherance of the alleged conspiracy, as described below.

45.     Defendants participated in meetings, conversations, and communications to discuss bids and price quotations for WWS sold in the United States.

46.     Defendants agreed during those meetings, conversations, and communications to rig bids and allocate the supply of WWS sold in or into the United States.

47.     Defendants submitted bids and price quotations to motor vehicle manufacturers in accordance with their conspiratorial agreements.

48.     Defendants knew and intended that their pricing actions regarding their sales of WWS to motor vehicle manufacturers would have a direct impact on prices for WWS sold to all direct purchasers throughout the United States.

49.     Defendants engaged in a single price-fixing conspiracy involving WWS that impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of WWS.  Defendants' scheme was implemented, it succeeded, and it affected the prices for all WWS.

50.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to Requests for Quotation ("RFQs").  OEMs issue RFQs to motor vehicle parts suppliers to obtain prices for parts, including WWS.

51.     OEMs use RFQs to procure parts for U.S.-manufactured motor vehicles in the United States and abroad.

52.     Typically, OEMs issue RFQs for motor vehicle parts, such as WWS, approximately three years before the OEM begins vehicle production.

53.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (a) the OEM issues the RFQ to multiple parts suppliers, (b) the suppliers submit bids, (c) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing, (d) the suppliers submit revised bids, and (e) the OEM selects the winner.

54.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

55.     When an OEM purchases WWS directly from the supplier to whom it awarded the contract, the OEM purchases the WWS at the winning price.

56.     That winning price is also used when suppliers that were not part of the RFQ process purchase WWS directly from the winning WWS bidder for incorporation into products manufactured and sold to vehicle manufacturers.  Those suppliers, who directly purchase WWS from the winning bidder, pay the winning bidder at least the winning price.

57.     It was important to the success of the cartel alleged herein that its members control and manipulate the prices paid by OEMs in order to control the prices paid by all other direct purchasers of WWS.

58.     Direct purchasers of WWS in addition to OEMs also paid supracompetitive prices as a result of Defendants' conspiracy because the price-fixed bid of the winning bidder established the floor at which all WWS were sold to direct purchasers.

**Government Investigation and Guilty Pleas**

59.     Various U.S. and international governmental authorities, including the U.S. DOJ via its Antitrust Division, are currently investigating anticompetitive conduct in connection with the production and sale of automotive parts, including Windshield Wiper Systems.  The Japan Fair Trade Commission ("JFTC") launched an investigation in July 2011, after Defendant Denso sought leniency by alerting the regulatory agency of the WWS conspiracy.  Japan's leniency program grants full immunity from prosecution to the applicant if the applicant admits its participation in the cartel and provides the JFTC with the relevant information detailing the anticompetitive violation.  Because of its admission and cooperation, Denso was not prosecuted criminally by the JFTC.

60.     In July 2011, the JFTC raided the offices of Defendants Denso and Mitsuba amid suspicions that the companies violated Japan's anti-monopoly law in relation to their sales of WWS.

61.     In a July 20, 2011 press release, Denso confirmed that the JFTC investigated the company's headquarters in Kariya, Aichi and other sales branches in Japan "regarding sales of certain automotive components."

62.     On July 20, 2011, *The Wall Street Journal* reported that Mitsuba was raided by the JFTC as part of the spreading investigation into suspected price fixing of automotive parts.

63.     As a result of these raids and investigations, on November 22, 2012, the JFTC issued cease and desist orders and surcharge payment orders to Defendant Mitsuba for its involvement in a price-fixing conspiracy in connection with the sale of WWS in violation of Article 3 of Japan's Antimonopoly Act.  The JFTC fined Mitsuba 1.1 billion yen (USD $13.5 million).  Defendant Denso admitted to its participation in the price-fixing conspiracy, but

received immunity from fines because it provided information to the JFTC that led to the investigation.

64.     On September 26, 2013, the DOJ charged Defendant Mitsuba with participating in a "combination and conspiracy to suppress and eliminate competition on the automotive parts industry by agreeing to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the price" of WWS in violation of the Sherman Act.

65.     According to the criminal Information filed, Defendant Mitsuba and its co-conspirators carried out the WWS conspiracy by:

(a) participating in meetings, conversations, and communications in the United States to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c) agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d) agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e) submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f) selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g) accepting payment for certain automotive parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h) engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i) employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

66. Additionally, the DOJ charged Defendant Mitsuba with obstruction of justice after executives of Mitsuba, acting on the company's behalf, directed employees "to locate, conceal and destroy documents and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere" in violation of 18 U.S.C. § 1519. According to Mitsuba's plea agreement, after learning that the FBI executed a search warrant on the offices of a co-conspirator, executives from Mitsuba and its U.S. subsidiary, American Mitsuba Corporation, directed subordinates and other employees to conceal and destroy documents and electronic files in their possession, custody or control.

67. On September 26, 2013, the DOJ announced that Defendant Mitsuba had agreed to pay a $135 million criminal fine and plead guilty to a two-count criminal Information charging Mitsuba with engaging in a conspiracy to allocate the supply of, to rig bids for, and to fix, stabilize and maintain the prices of WWS sold in the United States and elsewhere" from

January 2000 until at least February 2010.  On November 6, 2013, Mitsuba pleaded guilty to these charges.

68.     In a September 26, 2013 press release, U.S. Attorney General Eric Holder stated that "[t]he Department of Justice will continue to crack down on cartel behavior that causes American businesses and consumers to pay higher prices for the products and services they rely upon in their everyday lives."

69.     According to the Plea agreement filed in connection with this settlement:

[Mitsuba] through its officers and employees, engaged in discussions and attended meetings with representatives of other major automotive parts manufacturers.  During these discussions and meetings, agreements were reached to allocate the supply of certain automotive parts sold to automobile manufacturers, rig bids quoted to automobile manufacturers for certain automotive parts, and to fix, stabilize, and maintain the prices, including coordinating price adjustments requested by automobile manufacturers, of certain automotive parts sold to automobile manufacturers in the United States and elsewhere.

70.     Defendant Mitsuba carried out its illegal scheme along with Denso and other unnamed co-conspirators.

## PLAINTIFF'S CLAIMS ARE TIMELY

71.     Plaintiff incorporates by reference the allegations set forth above and adopts same as though fully set forth herein.

72.     Plaintiff and the members of the Class had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until at least July 20, 2011, the date when the JFTC antitrust investigations of WWS manufacturers became public.  As a result, Plaintiff and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the earliest, July 20, 2011.

73.    No information in the public domain was available to Plaintiff and the members of the Class prior to July 20, 2011, when the JFTC raids of WWS manufacturers became public. Prior to that time, there was insufficient information to suggest that any one of the Defendants was involved in a conspiracy to price-fix and rig bids for WWS.  For these reasons, the statute of limitations as to claims alleged herein did not begin to run until, at the earliest, July 20, 2011.

74.    Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Class until at least July 20, 2011.  Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiff and the Class, from at least as early as January 2000.  During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise to the instant Complaint.

75.    Before at least July 20, 2011, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct, and did not know before then that they were paying supra-competitive prices for WWS throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiff and the members of the Class that would have suggested to Plaintiff and the members of the Class that they were being injured by Defendants' unlawful conduct.

76.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

77.    By its very nature, Defendants' anticompetitive conspiracy was inherently self-concealing.  WWS are not exempt from antitrust regulation and, thus, Plaintiff and the members of the Class reasonably considered it to be a competitive industry.  For example, the DOJ press release states that the Defendants "took measures to keep their conduct secret by using code

names and meeting in remote locations."  Furthermore, Mitsuba took additional steps to destroy evidence as its misconduct was being discovered.

78.     During these meetings, conversations, and communications, Defendants and their co-conspirators agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

79.     Defendants likewise agreed to allocate the supply of WWS sold to customers in the United States and elsewhere.

80.     Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

81.     In accordance with the agreements reached by Defendants, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

82.     Plaintiff and the members of the Class could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conduct.

83.     Plaintiff received various pricing information from one or more of Defendants or their co-conspirators.  Plaintiff had no way to know that these prices were higher than they should have been due to the conspiracy alleged herein.

84.     For these reasons, the statute of limitations applicable to Plaintiff's and the Class's claims was tolled and did not begin to run until at least July 20, 2011.

## ANTITRUST INJURY

85.     Defendants' conspiracy caused injury to Plaintiff and members of the Class by suppressing price competition among WWS manufacturers, thereby depriving all direct purchasers of WWS of the benefits of a competitive market and setting prices of WWS at artificially high levels.

86.     As a direct result of Defendants' conspiracy, Plaintiff and members of the Class have been injured in their business or property in that they paid more for WWS than otherwise would have been the case in a competitive market.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 –Against All Defendants)

87.     Plaintiff incorporates by reference all of the above allegations as if fully set forth herein.

88.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination, or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for WWS sold in or into the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

89.     The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

90.     The contract, combination or conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices for WWS sold in or into the United States.  Such contract, combination, or conspiracy constitutes

a *per se* violation of the federal antitrust laws.

91.     Defendants succeeded in rigging bids and fixing, raising, maintaining, and stabilizing the prices of WWS sold in or into the United States during the Class Period.

92.     The conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

93.     For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

> a.      Participating in meetings and conversations in the United States and Japan to discuss the bids and price quotations of WWS to be submitted to direct purchasers in the United States;
>
> b.      Agreeing on bids and price quotations to be submitted to direct purchasers in the United States;
>
> c.      Agreeing to manipulate prices and allocate supply of WWS sold in or into the United States in a manner that deprived direct purchasers of free and open competition;
>
> d.      Agreeing to coordinate price adjustments in the United States;
>
> e.      Submitting bids, price quotations, and price adjustments to direct purchasers of WWS in accordance with the agreements reached;
>
> f.      Selling WWS to direct purchasers in the United States at supracompetitive prices; and
>
> g.      Employing measures to conceal the true nature of their unlawful conduct from Plaintiff and other members of the Class in furtherance of the conspiracy.

94.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for WWS than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.     That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.     That Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.     That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  December 17, 2013                    Respectfully submitted,


/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Road: Ste. 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone:(215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
Michael L. Silverman
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4510
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com
msilverman@fklmlaw.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whose@kohnswift.com
dabrahams@kohnswift.com

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
**PRETI FLAHERTY, BELIVEAU & PACHIOS LLP**
One City Center, P.O. Box 9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com

Lee Albert
Gregory B. Linkh
**GLANCY BINKOW & GOLDBERG LLP**
122 East 42nd Street, Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
lalbert@glancylaw.com

glinkh@glancylaw.com


W. Joseph Bruckner
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South
Minneapolis, MN 55401
Telephone: (612) 339-6900
wjbruckner@locklaw.com

Attorneys for Plaintiff Tiffin Motor Homes, Inc.